**UNITED STATES DISTRICT COURT**

**WESTERN DISTRICT OF NORTH CAROLINA**

CASE NO. 5:22 cv 146

**JENNIFER LASHUA**

    **Plaintiff,**

**COMPLAINT**

vs.

**TOWN OF MOORESVILLE**

    **Defendant(s)**

---

## I. JURISDICTION

1. This action is brought pursuant to the Americans with Disabilities Act of 1990, as amended for discrimination based on disability see 42 U.S.C. sections 12112 to 12117, *et seq.* (the ADA). Employment discrimination based on disability is also brought under the North Carolina Retaliatory Employment Discrimination Act, N.C. Gen. State. Section 95-241 ("REDA") and North Carolina tort law. Jurisdiction is also based on 28 U.S.C. Sections 1331, 1343, and 42 U.S.C. Sections 1981 et seq. Where employment discrimination based upon age is alleged below, jurisdiction for employee's retaliation claims is conferred by, 28 U.S.C. Sections 626(c)(1) and 626(e)- the ADEA; and all available and appropriate relief is sought.

1

Case 5:22-cv-00146-KDB-DSC   Document 1   Filed 10/18/22   Page 1 of 13
Case 5:22-cv-00146-KDB-SCR   Document 1   Filed 10/18/22   Page 1 of 13

## II. PARTIES

2. The undersigned PLAINTIFF, Jennifer Lashua, resides at 9069 Rosalyn Glen Rd., Cornelius, NC, 28031 (Mecklenburg county), with email of jenlashua@gmail.com. Plaintiff is a US citizen with a birth date of ▊▊▊ ▊ 1964. She is otherwise qualified for employment and is a person with a disability within the meaning of the Americans with Disabilities Act, as amended (i.e., impairment of major life activities). Her medical diagnosis is ▊▊▊▊▊▊▊▊ Jennifer Lashua is hereinafter referred to as Plaintiff.

3. The DEFENDANT is the Town of Mooresville and employs 50 or more persons with main offices at 413 N. Main Street, Mooresville, 28115; this is a large town located in the southwestern section of Iredell county, North Carolina and includes the Mooresville Public Library with contact number (704) 664-2927 and is more specifically located at 304 S. Main Street, Mooresville, North Carolina, 28115. The Town, the Library and its managerial employees are hereinafter referred to as "Defendant(s)".

## III. EXHAUSTION OF ADMINISTRATIVE REMEDIES

4. The claims raised herein for discrimination based on disability, failure to accommodate my disability, unfair and unequal terms and conditions of employment, demotion with arbitrary and excessive pay reduction and retaliation started on June 18, 2020, with serious retaliatory harm on March 15, 2021. Plaintiff asserts that discriminatory and unequal treatment continues through the present time.

5. On March 29, 2021, Plaintiff begin grievance policy protocols. Protocol begins with Supervisor, then Director and finalizes with Town Manager. The process ends with a letter dated May 24, 2021, from Town Manager.

6. On June 21, 2021, Plaintiff sends complaint to EEOC. On August 8, 2022, Plaintiff receives letter from the EEOC. This letter confirms that the EEOC gives Plaintiff a "Right To Sue" and Plaintiff has 90 days to file a claim in Western district Federal Court of NC. **EXHIBIT A**.

7. Defendants' conduct is discriminatory with respect to disability and alternately, age. More than 60 days have lapsed since receipt of EEOC.

2

## IV. STATEMENT OF FACTS SUPPORTING CLAIMS

8. On April 19, 2005, Plaintiff was hired by the Town of Mooresville to work at Mooresville Public Library in a job titled Administrative Specialist. She was employed in such capacity for 13 years.

9. During those 13 years, Plaintiff was privately diagnosed with ▓▓▓▓▓ ▓▓▓▓▓, a potentially disabling disease of the brain and spinal cord (central nervous system); the disease causes symptoms of numbness/weakness in one or more limbs, electric-shock sensations in the neck, lack of coordination, unsteady gait, vision problems often with pain, strange speech, fatigue, dizziness, tingling and/or pain and bladder dysfunction. Most people with ▓▓ have a relapsing-remitting disease course. Complications often include muscle stiffness or spasms, paralysis, forgetfulness or mood swings, depression (taken from <u>Mayo Clinic Explains ▓▓▓▓▓▓▓▓▓▓</u> website).

10. At all relevant times during those 13 years, Plaintiff received reasonable accommodations from the former Library Director John Pritchard. Those accommodations included adherence to the physical requirements published by that job category and other reasonable accommodations.

11. On February 11, 2019, the Defendant's newly hired Library Director promoted Plaintiff to "Cataloging Specialist" and granted her a salary increase from $45,475 to $47,749, effective immediately.

12. The published job description for the employee's position included limited physical requirements for which Plaintiff is and continues to be capable of and qualified to perform. Specifically, the published job description requires Plaintiff "*be able to perform light work, exerting up to 20 pounds of force occasionally, and/or up to 10 pounds of force frequently, and/or a negligible amount of force constantly to move objects*", see **EXHIBIT B.**

3

13. On August 12, 2019, Defendant determined to remove Plaintiff from "probationary" status in her new position. Her job performance appraisals demonstrated her mastery of the new job tasks. With the end of the probationary period Plaintiff was granted a merit increase of 2.5% in wages. Defendant is in possession of all performance reviews through that time and virtually all reflect that Plaintiff was an employee in "good" standing. Defendant's records of her job performance show "meets expectations". Defendant increased her salary to $48,943.

14. On September 5, 2019, job performance evaluations were completed by Supervisor Chao Huang, reporting that *"the past review period for [Plaintiff] has been good"* and confirmed that Plaintiff *"learned maintaining holdings records, processing new books for cataloging(before and after) and deleting weeding materials from the system. She also works with other divisions for pulling holds and shelving materials"*, **EXHIBIT C**.

15. On January 31, 2020, Plaintiff consulted her doctor regarding increased symptoms ▮▮▮, meaning pain, fatigue, and weakness. Various medical procedures were ordered and completed privately.

16. On February 27, 2020, Plaintiff was advised by her doctor that "new lesions" had appeared on parts of her brain. Neurologist and Plaintiff discussed treatments for progression of disability. Doctor advised elimination of excessive physical work, adding to the stress, and therefore a dangerous progression of disability.

17. On April 22, 2020, Plaintiff met with Defendant's Tiffany Shelley of the Human Resources (HR) department and made formal disclosure of her disability and prohibition against heavy labor above the job description weight of 20 lbs. Plaintiff awaited notice of Defendant's formal protocol and for discussion on the need for accommodations. Ms. Shelley did not propose any immediate response, and she did not agree to ensure Plaintiff's work safety requirements i.e. the limit on heavy exertion to lbs. Plaintiff was told to have neurologist complete a form substantiating the need for accommodations. No other instruction, promise of confidentiality,

4

Case 5:22-cv-00146-KDB-DSC   Document 1   Filed 10/18/22   Page 4 of 13
Case 5:22-cv-00146-KDB-SCR   Document 1   Filed 10/18/22   Page 4 of 13

interviews or inquiries were provided or undertaken and Plaintiff received no other notices, forms, or written protocols

18. Defendant received the physician's form but no action was taken and no further form of discussion was had. Plaintiff did not receive written instruction, meetings, in-servicing and/or notices of procedure which may have been required by Defendant. There was no explicit agreement to restrict lifting, hauling and relocating books. Plaintiff was successful in processing of thousands of pounds of materials in the months after disclosure of disability.

19. Beginning on the date Plaintiff disclosed her disability and requested reasonable accommodations and fair treatment at work, Defendant began a campaign to undervalue, harass, demote and bully Plaintiff to retire or quit. Evidence shows that, at all times, Plaintiff worked diligently to complete assigned workloads but that the vast majority of Plaintiff's work was neither "observed" nor "evaluated" by Defendant(s).

20. Beginning on the date Plaintiff disclosed her disability and need for accommodation, Defendant actively moved to assign her to perform hard physical tasks to Plaintiff, requesting her to carry, lift and move more than 50 pounds of force several times a day and every day. She was treated differently than other similarly qualified employees and "frequently" assigned tasks outside her job description.

21. On June 18, 2020, for the first time in 15 years of employment, Plaintiff received a "Below Expectations" job performance rating, **EXHIBIT D**. This review was made a part of the permanent employment performance file; it was approved by Library Director Lytle and completed by Supervisor Chao Huang.

22. Plaintiff objected in writing to the retaliatory and derogatory review because it contained false, unfair, misleading and biased allegations of incapacity to do the most basic tasks of the job (applying book labels). Supervisor Chao Huang suddenly charged that the *"team has been very patient with her learning process and has tried many effects (sic) to help*

5

*her maintain the quantity and quality of her job."* And *"Meanwhile we observed her inconsistency (sic) performance issues"*. No issues listed.

23. Evidence shows that, first, there was no "team" and second, the "learning process" had terminated with Defendant's decision to remove Plaintiff from probationary status. Third, the bulk of Plaintiff's job was hauling books and the quantity of books was excessive. Finally, the critique contained no specifics about unsatisfactory performance.

24. The very next day, June 19, 2020, Supervisor Huang formally assigned Plaintiff to the most physically demanding job in the division- the morning "book drop". See **EXHIBIT E.** This responsibility requires emptying the exterior crates of returned books that patrons continuously drop off each day, i.e. the book drops, **EXHIBIT E-1** photo of the "book drops" which Plaintiff cleared out while in the parking lot **EXHIBIT E-2** photo of crate used for hauling. The distance Plaintiff was required to push the mobile crate when it was filled with books can be seen in this photo **EXHIBIT E-3.** Once at her workstation, Plaintiff was responsible for moving books out of crate onto tables. The mobile crate, often comprising of between 250 and 400 lbs. of materials had to be unloaded at a very fast pace. No other staff were assigned to assist Plaintiff. No motorized equipment support was available.

25. On July 8, 2020, Supervisor Huang requested Plaintiff provide all confidential medical information previously submitted to Tiffany Shelley in order "to discuss with Director".

26. On July 23, 2020, Plaintiff was asked to attend a meeting with three Library Managers: Chao Huang, Nancy Rath and Tiffany Shelley; it was expected to be an opportunity to discuss the formal demand for reasonable accommodations and hash-out issues relating the negative job review. It was not. Instead, Ms. Shelley handed out a previously written Performance Improvement Plan, (PIP), to be implemented against Plaintiff. There was no input accepted from Defendant. A PIP is Defendant's preliminary notice of disciplinary action-demotion, termination and its presentation replaced planning for reasonable accommodations. Throughout this meeting,

6

Case 5:22-cv-00146-KDB-DSC   Document 1   Filed 10/18/22   Page 6 of 13
Case 5:22-cv-00146-KDB-SCR   Document 1   Filed 10/18/22   Page 6 of 13

Supervisor Chao Huang visibly appeared under tremendous stress and was in fact was crying.

27. This discrimination Complaint specifically alleges that the Defendant's reaction to declaration of disability and claim for reasonable accommodations was illegal under the ADA and Defendant clearly retaliated against Plaintiff, all with the intention of forcing her to quit or otherwise permanently separate Plaintiff from the Town's workforce. Nothing in the June/July 2020 documents provided Plaintiff with clear or understandable notice of what part of Plaintiff's job performance was suddenly deemed "Below Expectations". Areas of concern or inadequacies were vague, unsubstantiated and/or out-of-proportion to the overall output, product and quantity of services rendered. No evaluation of physical work output was undertaken or acknowledged.

28. From July 23, 2020, through December 2020, Plaintiff was denied reasonable accommodations and experienced unfair treatment clearly intended to coerce her to retire or quit. It was apparent that Plaintiff was the only one being asked to perform heavy labor. She moved thousands of pounds of books without accommodation. In addition, Defendant used its PIP procedure to create a false narrative that Plaintiff was "inconsistent" in work product. Management repeatedly and concertedly assigned minor book processing errors to Plaintiff and characterizing such errors as grounds for demotion; management began a supervisory campaign falsely alleging lack of training, lack of cooperation and lack of qualification.

29. The PIP called for in-person weekly meetings with the immediate Supervisor Huang, prior to this, such meetings occurred semi-annually. Until implementation of the PIP, Supervisor Huang never spent more than 15 minutes/day in or near Plaintiff's workspace. Plaintiff was told that these meetings were intended to "go over errors" made that week.

30. Evidence shows that the PIP called for Plaintiff to rely on instructions that were posted on a "whiteboard." Defendant treated Plaintiff unfairly by placing the whiteboard too far away for her to consult while working. She

7

Case 5:22-cv-00146-KDB-DSC   Document 1   Filed 10/18/22   Page 7 of 13
Case 5:22-cv-00146-KDB-SCR   Document 1   Filed 10/18/22   Page 7 of 13

was told that the whiteboard was there for assistance but the instructions were constantly changing; they were hand-written and mostly illegible.

31. On July 31, 2020, Supervisor Huang produced a document described as "First Review with Plaintiff" It suggested that accommodations were being considered, **EXHIBIT F**. None were ever introduced and heavy lifting of 50 pounds plus continued to be assigned exclusively to Plaintiff.

32. Plaintiff's doctor had prescribed new and stronger medications to address dangerous progression of disease. Stress and the over-exertion at work caused injury to Plaintiff and she had to receive therapies after-work several times per week.

33. On August 12, 2020, Supervisor Huang sped up the work pace and heightened physical burden on Plaintiff. Management was now placing Plaintiff on tasks with high risk for injury, including falling bookshelves and constant disruption of workflow.

34. On August 25, 2020, Plaintiff assigned new tasks involving heavy lifting and is expected to use lunch hour to package 9 BWB boxes of books, per "white board" directives. At this time, Plaintiff again explains how and why Supervisor Huang's use of whiteboard is not a "reasonable accommodation"; she is ignored.

35. On August 28, 2020, 2020 Supervisor Huang produced another review of Plaintiff pursuant to the PIP wherein she stated "*the tasks with deadlines on the white board made her extremely anxiety (sic). I (Huang) reminded her that the white board is a tool of communication that help her stay consistency and meeting goals(sic).*" Supervisor Huang wrote that "*all the accommodations we provided based on her doctor's notes, her won't be labor intense (sic) and she will have more time for training and learning.*" **EXHIBIT G**.

36. Plaintiff repeatedly advised Supervisor the whiteboard is placed too far from her workstation to be read, causing delays and unnecessary work disruption.

37. On September 25, 2020, Plaintiff was assigned exclusive responsibility for handling the Library's main "book drop", requiring intense and excessive physical labor, including lifting, and hauling well-over 100 lbs. of books

8

several times per week. No other employee was assigned to assist early in the morning.

38. During the period of reviews, Defendant began collecting performance critiques from Plaintiff's co-workers, creating a hostile work environment. Vague criticisms about "'inconsistencies', or 'jumping between tasks" were not accompanied by examples of any "observations, discussions, reports or quality and quantity of services delivered" as called for in the published description for Cataloging Specialist.

39. On October 2, 2020, and again on October 9, 2020, Supervisor incorrectly attributes co-worker's errors in property-labeling to her, stating "we noticed" errors in applying taped labels to "multi books"; notes from this meeting mentions constant increase of physical work **EXHIBIT H.**

40. On October 8, 2020, Plaintiff notes that book drop assignment was very labor intensive. It required two hauls of mobile container shown in photos attached. Per definition, that would be handling well over 200 hundred pounds of material every morning. Plaintiff was required to over-exert herself each morning before starting her Cataloging duties. Plaintiff left early that day due to being unwell.

41. On December 11, 2020, Plaintiff had another 'weekly' PIP review of her job performance. Plaintiff informed Huang she in fact had not been doing the incorrect labeling. Huang and Plaintiff went to Plaintiff's workspace to observe and confirm that Plaintiff had not processed the problem books. Supervisor Huang had incorrectly attributed the labeling problems to Plaintiff. No efforts to correct this misalignment of blame was had.

42. Plaintiff proceeded to the Library Director Marion Lytle office. Director asked Plaintiff "have you ever thought about retiring?" Plaintiff expected her permanent job performance records be corrected by the Director Lytle. Instead, Lytle had asked Plaintiff about retirement.

43. On December 16, 2020, Supervisor Huang retaliated at Plaintiff with a ridiculous and destructive mid-year Performance Appraisal. She writes an untruthful report which becomes part of Plaintiff's personnel file. Comments as in "*Plaintiff is continuing to need to improve the quantity and quality of item processing, avoid missing property labels, label protector or RFID*

9

Case 5:22-cv-00146-KDB-DSC   Document 1   Filed 10/18/22   Page 9 of 13
Case 5:22-cv-00146-KDB-SCR   Document 1   Filed 10/18/22   Page 9 of 13

*tags, keep property labels centered on the title paper if possible, and improve the efficiency while using good judgement."* Plaintiff processed thousands of pounds of materials. She processed and assisted all of the library divisions when asked. And yet supervisor continues with unjust review by stating *"tasks were not completed with a collaborative fashion"*.

44. Plaintiff is subjected to demeaning and degrading work assessments which have now been going on for several years, intimidating Plaintiff to resignation. Management's continual placement of probation places Plaintiff in fear of losing livelihood by attributing job performance "errors" to her. Management validates the need to be punitive with a demotion. A demotion effectively terminates Plaintiff's access to the full array of employee benefits, promotions, transfers, etc. indefinitely. No discussion was had regarding this demotion and its validity. No "collaborative' approaches on her disability accommodations ie., the inaccessible whiteboard lists, the continuous assignment of hard labor, or the other physical work accommodations.

45. The Mid-Year Appraisal labels Plaintiff's work productivity as "Poor". Plaintiff is not recognized for contributions, stated as 'essential labor', giving zero credit for lifting, sorting, carting, hauling hundreds of pounds of books daily. Plaintiff repeatedly brought concerns to management. Plaintiff's concerns are not addressed but ignored. In a few months Plaintiff will have worked for the Defendant for seventeen years, but any concerns brought up are ignored by management. The hostility is strident and aggressive towards Plaintiff. Judgements are placed into Plaintiff's personnel file as *"continuing to need to improve the quantity and quality of item processing, avoid missing property labels, label protector or RFID tags, keep property labels centered on the title paper if possible, and improve the efficiency while using good judgement."*

46. Defendant's management staff neglected to record that this employee had completed a comprehensive, library-wide "weeding" of items, that she had processed thousands of pounds of books and hauled daily book returns for huge distances. It failed to report that Plaintiff was assigned a workstation by the main delivery door and entrance, requiring Plaintiff to constantly be disrupted from applying property labels (and centering them on the title page if possible) to jump up and help with the door and

10

Case 5:22-cv-00146-KDB-DSC   Document 1   Filed 10/18/22   Page 10 of 13
Case 5:22-cv-00146-KDB-SCR   Document 1   Filed 10/18/22   Page 10 of 13

deliveries of new books. It failed to report that, in one day alone, Plaintiff had removed over 400 items from the library's systems. Each time she was asked to remove books she had to walk around the large facility in search off one of the 2 or 3 "hefty carts" that is shared by the entire facility.

47. On March 15, 2021, Defendant demoted Plaintiff, **EXHIBIT I**. Plaintiff was assigned a work site at the Library's front door; she was told it was her new job to "greet" patrons and police mask-wearing pursuant to CDC pandemic requirements. The demotion, agreed to by the Town Board, removed Plaintiff from all co-workers, terminated access to intra-office communications and substantially decreased her pay.

## V. CAUSE OF ACTION

48. Plaintiff's rights under the Civil Rights Act, the Americans with Disabilities Act and corresponding State laws were violated by Defendant as alleged above. Defendants' response to the disclosure of a disability together with the need for reasonable accommodations was and continues to be discriminatory based on disability. Should the fact-finder conclude that discrimination was also motivated by Plaintiff's age, an alternate claim for the same injuries and damages is also made.

49. Instead of opening a discussion about limiting the assignment of heavy-lifting and hard labor to Plaintiff, she was assigned increasingly physically demanding tasks. Discriminatory treatment came in the form of new assignments which markedly *increased* the physical exertion and in performance appraisals that were false and/or exaggerated.

## VI. INJURY and RELIEF REQUESTED

50. On March 15, 2021, Defendant's wrongful Demotion imposed a decrease in salary from $50,901 to $44,950.00 for which Plaintiff is seeking compensatory damages. Under the federal statutes listed herein, Plaintiff seeks declaratory, compensatory, and equitable relief, including reinstatement, compensation for lost income and as available, punitive relief.

51. Plaintiff is seeking full reinstatement of salary and position; and equal access to other job openings within the Library. She is seeking all out-of-

11

Case 5:22-cv-00146-KDB-DSC   Document 1   Filed 10/18/22   Page 11 of 13
Case 5:22-cv-00146-KDB-SCR   Document 1   Filed 10/18/22   Page 11 of 13

pocket expenses and compensation for the reduction in retirement benefits; as such Plaintiff is seeking "front pay" - meaning wages that will continue to lost in the future, and emotional distress damages; should the Court find egregious circumstances, Plaintiff is seeking punitive damages; finally, she is seeking attorneys' fees/court costs should Plaintiff find a local lawyer.

52. Plaintiff is seeking all other relief that may be available to her or deemed just and proper by this Court.

## VII. JURY TRIAL REQUESTED

53. YES _____          NO ___X___

Submitted by,

*Jennifer Lashua*

**JENNIFER LASHUA, pro se litigant**

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned JENNIFER LASHUA declares under penalty that she is the PLAINTIFF in the above action, that she has read the above complaint and that the information contained therein is true and correct, 28 U.S.C. Section 1746 and 18 U.S.C. Section 1621.

Executed at Cornelius, North Carolina on October 18, 2022

*Jennifer Lashua*
(signature)

12

Case 5:22-cv-00146-KDB-DSC   Document 1   Filed 10/18/22   Page 12 of 13
Case 5:22-cv-00146-KDB-SCR   Document 1   Filed 10/18/22   Page 12 of 13

Certification and Closing Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

A. For Parties Without an Attorney: I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: October 18, 2022

Signature of Plaintiff: *Jennifer Lashua*

Printed Name of Plaintiff: Jennifer Lashua

13

Case 5:22-cv-00146-KDB-DSC   Document 1   Filed 10/18/22   Page 13 of 13
Case 5:22-cv-00146-KDB-SCR   Document 1   Filed 10/18/22   Page 13 of 13